1  Mark Gomez, Esq. (SBN 289164)
   Ashlie E. Fox, Esq. (SBN 294407)
2  Gomez & Simone, P.C.
   3055 Wilshire Blvd., Suite 1200
3  Los Angeles, CA 90010
   Telephone (855) 219-3333
4  Facsimile (818) 574-6730
5  Email: info@gomezsimonelaw.com

```
FILED
CLERK, U.S. DISTRICT COURT
Feb 19, 2016
CENTRAL DISTRICT OF CALIFORNIA
BY: ___PMC___ DEPUTY
```

6
7  Attorneys for Plaintiffs, GREG FRANK and SHERRY FRANK

8              IN THE UNITED STATES DISTRICT COURT

9                CENTRAL DISTRICT OF CALIFORNIA

10

11 | GREG FRANK, *an individual*; and SHERRY | Case No: 2:15-cv-05410
12 | FRANK, *an individual*.                 |
                                             | ***CORRECTED* SECOND AMENDED**
13 |            Plaintiffs,                  | **COMPLAINT FOR:**
                                             |   1- Promissory Estoppel
14 |                                         |   2- Negligence
                                             |   3- Negligent Misrepresentation
15 |              vs.                        |   4- Fraud
                                             |   5- Violation of Unfair Competition Law
16 |                                         |      (Bus. & Prof. Code §17200 et seq.)
17 | NOVAD MANAGEMENT CONSULTING,             |
    | LLC; CIMARRON SERVICE CORP. OF          |
18 | NEVADA dba CIMARRON TRUSTEE              |
    | SERVICES; THE SECRETARY OF              | **DEMAND FOR JURY TRIAL**
19 | HOUSING AND URBAN DEVELOPMENT,           |
    | WASHINGTON, D.C.; and DOES 1 through    | Complaint filed: June 5, 2015
20 | 20, inclusive,                           |
21 |
    |            Defendants.                  |
22

23

24    Plaintiffs GREG FRANK and SHERRY FRANK, both individuals (hereinafter referred
25 to as "Plaintiffs") hereby complain against Defendants, NOVAD MANAGEMENT
26 CONSULTING, LLC, CIMARRON SERVICE CORP. OF NEVADA dba CIMARRON
27 TRUSTEE SERVICES, THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT,
28

                                  1
                  *CORRECTED* SECOND AMENDED COMPLAINT

WASHINGTON, D.C., and DOES 1 through 20, inclusive (collectively "Defendants"), for causes of action alleged as follows:

## PARTIES

1. Plaintiffs, GREG FRANK and SHERRY FRANK are, and at all times relevant to this action were, residents of the County of Los Angeles, State of California. Plaintiffs resided in the real property commonly known as 624 North Yaleton Avenue, West Covina, California 91790 (the "Home" or "Subject Property"), APN No. 8458-018-026, legally described as:

> Lot 49 of Tract 20448, In the City of West Covina, County of Los Angeles, State of California, as Per Map recorded in Book 526, Pages 10 and 11 Of Maps, In The Office Of The County Recorder Of Said County.

2. Plaintiffs are informed and believe and based thereon allege that Defendant NOVAD MANAGEMENT CONSULTING, LLC ("NOVAD"), is a loan servicing entity in the business of providing business consulting services with its primary headquarters located in Maryland and principal place of business located at Suite 100 3309 Old Largo Road, Upper Marlboro, Maryland 20772. Plaintiff is further informed and believes that at all times relevant hereto, Defendant NOVAD MANAGEMENT CONSULTING, LLC has transacted and continues to transact business throughout the State of California, including the County of Los Angeles.

3. Defendant CIMARRON SERVICE CORP. OF NEVADA dba CIMARRON TRUSTEE SERVICES ("CIMARRON") is a business incorporated in the state of New Mexico with its principal place of business located at 425 Mechem Drive, Ruidoso, New Mexico, 88345. Plaintiff is further informed and believes that at all times relevant hereto, Defendant CIMARRON has transacted and continues to transact business throughout the State of California, including the County of Los Angeles.

4. Defendant SECRETARY OF HOUSING AND URBAN DEVELOPMENT, WASHINGTON, D.C. ("HUD") is an entity of the United States Government located at 451 Seventh Street, S.W., Washington, D.C. 20410.

2
*CORRECTED* SECOND AMENDED COMPLAINT

5. Plaintiffs do not know the true names, capacities, or basis for liability of Defendants sued as Doe 1 through 20. Each fictitiously named Defendant is in some manner liable to the Plaintiff, or claims some right, title, or interest in the Subject Property, or both.

### GENERAL ALLEGATIONS

6. The Subject Property has been part of the Frank family since 1955 when GREG FRANK's mother, Susan Frank, purchased the Home.

7. An Adjustable Rate Home Equity Conversion Deed of Trust was made on August 5, 2005 and recorded on August 12, 2005 ("Deed of Trust"). The trustor was to be The Susan Frank Revocable 1997 Trust, Susan Frank Trustee. The trustee was Fidelity National Title Insurance Company, and the Lender was Wells Fargo Bank, N.A. A true and correct copy of the Deed of Trust is attached hereto as **Exhibit A**.

8. The Home had been under the Trust name and subject to a reverse mortgage that was alleged to became payable upon Susan Frank's death in 2010.

9. Susan Frank passed away in 2010 and Plaintiffs became subject to the reverse mortgage.

10. For years, Plaintiffs only received notices from their servicer at the time, Deval, informing them of the beneficiary of the reverse mortgage, HUD. Plaintiffs faced no issues with the mortgage until 2014, when Defendant NOVAD began to service the mortgage.

11. On or around September 11, 2014, Plaintiffs received a letter at the Subject Property from NOVAD addressed to Susan Frank, GREG FRANK's mother. The letter stated that "as of September 29, 2014, NOVAD Management Consulting, LLC/ Sutherland Mortgage Services, Inc. (NOVAD Team), as a contractor for the U.S. Department of Housing and Urban Development (HUD), would be servicing [the] Home Equity Conversion Mortgage (HECM) account." The letter further stated that "[a]ll servicing functions will be handled by the NOVAD Team, a contractor for HUD." A true and correct copy of the Letter from NOVAD dated September 11, 2014 is attached hereto as **Exhibit B**.

12. On or about November 17, 2014, Defendant CIMARRON caused a Notice of Default and Foreclosure Sale ("NOD") to be recorded against the Subject Property. The NOD referenced "T.S. #14-13159-25" and set a sale date for the Subject Property for January 21, 2015. The

NOD further stated that "[p]er the Secretary of Housing and Urban Development, the estimated opening bid will be $325,501.82" and that "[t]he amount that must be paid by the Mortgagor, to stop the sale prior to the scheduled sale date is $325,326.82 as of 01/20/2015, PLUS all other amounts that are due under the mortgage agreement." The NOD was executed by Cathey E. Latner, Vice President of Cimarron Service Corp., of Nevada as "Foreclosure Commissioner." A true and correct copy of the NOD is attached hereto as **Exhibit C**.

13. Plaintiffs received a copy of the NOD by mail at the Subject Property. With the NOD, Plaintiffs received an additional document titled Fair Debt Collection Practices Act Notice ("Debt Collection Notice"). The Debt Collection Notice stated that the total amount of delinquency was $336,116.36, owed to The Secretary of Housing and Urban Development, Washington, D.C. A true and correct copy of the Debt Collection Notice is attached hereto as **Exhibit D**.

14. The Debt Collection Notice is does not contain a heading indicating from whom it originated and is unsigned, but it references "Our File No. 14-13159-25." Because this number matches the "T.S. #14-13159-25" found on the NOD executed by CIMARRON, Plaintiffs are informed and believe and thereon allege that the Debt Collection Notice was also prepared and sent to them by CIMARRON on behalf of HUD.

15. Plaintiffs were determined to keep the Home that had been in their family for sixty (60) years. In early January 2015, Plaintiffs decided to open escrow to purchase the home. Based on the payoff figure Plaintiffs received from Defendant CIMARRON, Plaintiffs were informed and reasonably believed that $336,116.36 was the amount required to purchase the Home.

16. To this end, Plaintiffs contacted their servicer, NOVAD, by telephone to advise that they intended to purchase the Home.

17. On or about January 8, 2015, Plaintiffs opened escrow with Inter Valley Escrow so that they could purchase the Home. Plaintiffs engaged Escrow Officer, Todd Glidden ("Mr. Glidden"), and his Escrow Assistant, Laurie Garcia ("Ms. Garcia"), at Inter Valley Escrow as their agents to coordinate obtaining the necessary information and to complete their purchase of the Home.

18. From the beginning, Plaintiffs and Inter Valley Escrow experienced nothing but problems in working with the mortgage servicer, NOVAD, and the "Foreclosure Commissioner," CIMARRON.

19. On January 12, 2015, Inter Valley Escrow, on behalf of Plaintiffs, sent a formal Request for Demand Statement ("Request for Demand") to CIMARRON, Attn: Payoff Department and Cathey Latner. The Request for Demand was sent by "High Importance" email at 11:53 a.m. by Ms. Garcia at Inter Valley Escrow to Amber Yaksich ("Ms. Yaksich") and Cathy Latner ("Ms. Latner") at CIMARRON. A true and correct copy of the Request for Demand is attached as **Exhibit E**.

20. On January 13, 2015, Ms. Garcia contacted Ms. Yaksich at CIMARRON by email to check that the Request for Demand had been received and to ask how long it would take to receive the payoff demand. Ms. Garcia did not receive a response.

21. On January 14, 2015, Ms. Garcia contacted Ms. Yaksich at CIMARRON by email to ask if Ms. Latner had had a chance to check on Plaintiffs' file for the demand because escrow was set to close on January 20, 2015 and they cannot close without the demand. Ms. Yaksich replied to Ms. Garcia by email and advised that Ms. Latner "was working on getting things situated" but was at a doctor's appointment. Ms. Yaksich advised she would have updated information for Ms. Garcia the following day.

22. On January 15, 2015, Ms. Garcia contacted Ms. Yaksich at CIMARRON by email to request a two day extension of the Subject Property sale date to accommodate the buyer's lender. Ms. Garcia did not receive a response.

23. On Friday, January 16, 2015, Ms. Garcia again contacted Ms. Yaksich at CIMARRON by email to check if the two day extension had been approved and to check on status of the payoff demand. On Monday, January 19, 2015, Ms. Yaksich responded to Ms. Garcia by email and stated that she apologized for the late response but CIMARRON closes at 1:00 p.m. on Fridays. She further stated that she would check with Ms. Latner about the matter as soon as Ms. Latner was in the office but that Ms. Latner had been "out of the office due to back problems."

24. On January 19, 2015, Ms. Garcia emailed a response to Ms. Yaksich, asking if there was anyone else at CIMARRON who could provide her with Plaintiffs' demand and extension. Ms. Garcia reminded Ms. Yaksich that the sale was set for January 21, 2015 and they still had not received anything. Ms. Yaksich responded to Ms. Garcia by email and advised that she just spoke with Ms. Latner, Ms. Latner was "working on it right now," and Ms. Latner was "going to talk to HUD" about the extension. Ms. Yaksich further indicated she or Ms. Latner would email later that day with more information. Ms. Garcia did not receive any further responses that day.

25. On January 20, 2015, Ms. Garcia emailed Ms. Yaksich at CIMARRON to advise that the Buyer (Plaintiffs) had signed loan documents and they were ready to proceed on their side, the only hold up was the payoff demand and extension needed from CIMARRON.

26. Also on January 20, 2015, Ms. Yaksich emailed a response to Ms. Garcia indicating that CIMARRON had gotten a one week extension and the sale was rescheduled to January 28, 2015. Ms. Yaksich stated that CIMARRON was still "waiting on the demand from Liz over at HUD." Plaintiffs are informed and believe and thereon allege that "Liz" actually refers to Elizabeth Richardson at NOVAD. Ms. Yaksich further stated that Ms. Latner was not in the office that day but would be in the following day to "finish this up."

27. On January 21, 2015, Ms. Garcia emailed Ms. Yaksich at CIMARRON to ask if Ms. Yaksich and Ms. Latner had been able to get together to provide the payoff demand figure and the extension letter. Ms. Garcia advised that Plaintiffs and their lender had everything ready for the purchase but those two items they needed from CIMARRON. Ms. Garcia did not receive a response.

28. On January 22, 2015, Ms. Garcia again emailed Ms. Yaksich at CIMARRON to request status on the payoff demand and extension letter because the loan documents that Plaintiffs signed were close to expiring at this point. Ms. Garcia did not receive a response.

29. On January 23, 2015, Ms. Yaksich emailed a response to Ms. Garcia advising that CIMARRON had closed the office the previous day to due to very bad weather and that Ms. Latner was not in yet that day. Ms. Yaksich promised to provide an update when Ms. Latner arrived. Ms. Garcia responded to Ms. Yaksich's email, stated that Plaintiffs absolutely needed

6
CORRECTED SECOND AMENDED COMPLAINT

1  the requested information that day, and asked if there was anyone else in the office who could
2  take care of it. Ms. Yaksich then responded that Ms. Latner was the only one in the office who
3  could "do payoffs."
4  30. Later on January 23, 2015, Ms. Yaksich at CIMARRON called Ms. Garcia to advise
5  CIMARRON would be providing Plaintiffs' payoff demand that afternoon. Ms. Garcia did not
6  receive anything from CIMARRON that day.
7  31. On January 26, 2015, Ms. Garcia called CIMARRON and spoke with "Ann," who
8  advised her that Ms. Yaksich and "Hallie" were working on Plaintiffs' demand. Also on January
9  26, 2015, Ms. Garcia emailed Ms. Yaksich to request the demand as soon as possible. Ms.
10 Yaksich emailed a response to Ms. Garcia informing her that "Hallie" would be working on the
11 demand and that "Hallie" gets to the office around noon. Ms. Garcia emailed a response to Ms.
12 Yaksich stating that Plaintiffs absolutely needed the demand that morning and that it has never
13 taken her so long to get a demand before, even for foreclosures.
14 32. Later on January 26, 2015, Ms. Yaksich emailed Ms. Garcia to advise that CIMARRON
15 was still waiting on NOVAD to approve Plaintiffs' payoff statement. Ms. Yaksich stated that
16 CIMARRON "cannot do anything on [their] end until [NOVAD] sends ok to do so."
17 33. Ms. Garcia then called a contact at NOVAD, who informed her the payoff had been sent
18 to CIMARRON that morning. When Ms. Garcia emailed Ms. Yaksich about that, Ms. Yaksich
19 stated that NOVAD had only sent CIMARRON bidding instructions and that Ms. Yaksich was
20 trying to get in touch with "Liz" at NOVAD because CIMARRON did not receive the payoff
21 demand.
22 34. On January 27, 2015, Ms. Garcia again emailed Ms. Yaksich at CIMARRON to request
23 the payoff demand. That afternoon, Ms. Yaksich faxed the payoff demand to Ms. Garcia and
24 emailed Ms. Garcia to let her know she had done so.
25 35. Despite daily requests, Plaintiffs, by and through their agents at Inter Valley Escrow, did
26 not receive the necessary payoff demand from CIMARRON and/or NOVAD and/or HUD until
27 January 27, 2015, <u>one day prior to the scheduled sale date</u>.
28

36. On January 27, 2015, Ms. Latner faxed the Trustee's Demand for Payoff to Plaintiffs' agent, Ms. Garcia at Inter Valley Escrow. Ms. Latner also cc'd HUD. The demand stated an increased payoff amount of $363,228.14, was set to expire on February 2, 2015, and stated the foreclosure sale was now scheduled for February 3, 2015. A true and correct copy of the Trustee's Demand for Payoff is attached hereto as **Exhibit F**.

37. Plaintiffs were ready, able, and willing to provide the original amount, but were shocked and confused that the demand had suddenly increased by almost $30,000. Neither Plaintiffs nor their agents at Inter Valley Escrow could understand how the demand could be so high when a mere two months had passed since the NOD stated the amount owed was $325,326.82 plus fees and that figure provided on the Debt Collection Notice was $336,116.36.

38. Initially, Plaintiffs believed the increased demand was simply a mistake. Seeking clarification and assistance, Plaintiffs continued to try to contact their servicer, NOVAD. Plaintiffs spent countless hours attempting to contact Elizabeth Richardson on the phone and by e-mail, but were not given a straight answer and were told the person handling their case was out of the office.

39. Further, on January 29, 2015, Ms. Garcia exchanged emails and telephone calls with Ms. Latner at CIMARRON to request that the error in the demand be corrected. Ms. Latner informed Ms. Garcia that "the information that was transferred to the file was wrong."

40. On January 30, 2015, Ms. Garcia emailed Elizabeth Richardson at NOVAD to request that the error in Plaintiffs' demand be corrected.

41. Fearing that they would lose their long time family Home, Plaintiffs sought an extension to collect the additional $30,000 that Plaintiffs had not known they needed. Plaintiffs borrowed money out of Plaintiff SHERRY FRANK's 401k in reliance on the initial figures provided by CIMARRON and/or NOVAD and/or HUD in the NOD and Debt Collection Notice sent to Plaintiffs by CIMARRON.

42. On February 2, 2015, GREG FRANK spoke with Ms. Latner at CIMARRON and she agreed to postpone the sale until February 11, 2015 to allow Plaintiffs a "chance to resolve the payoff issue and allow his sale to go through."

43.   Plaintiffs sought to fund the additional amount they now needed but realized they needed more time, so they also sought a longer extension from CIMARRON and NOVAD. Meanwhile, Ms. Garcia continued to email with Ms. Latner at CIMARRON and Elizabeth Richardson at NOVAD to help Plaintiffs resolve the issues.

44.   However, on or about February 11, 2015, while Plaintiffs were still seeking an extension letter, as well as working on obtaining the additional funding, a foreclosure sale was held at which the Subject Property reverted to the foreclosing beneficiary, Defendant HUD. A true and correct copy of the Foreclosure Deed is attached hereto as **Exhibit G.**

45.   On February 11, 2015, Ms. Latner at CIMARRON emailed Plaintiff, GREG FRANK, Plaintiffs' agent, Ms. Garcia, and Ms. Richardson at NOVAD. Ms. Latner informed them that CIMARRON was instructed by NOVA D to proceed with the sale and that the Subject Property had reverted to HUD at the sale.

46.   GREG FRANK spent the next two months trying to resolve the issue. GREG contacted Davon Kelly, Nikki Jackson, Elizabeth Richardson, and Sha Terral at NOVAD. GREG also contacted Ms. Latner at CIMARRON and Ray Brewer at HUD. No resolution was reached, but Elizabeth Richardson did tell GREG that "CIMARRON quoted the wrong figure" in the initial NOD and Debt Collection Notice sent to Plaintiffs.

47.   If Plaintiffs had been allowed more time or had been provided with the correct figures initially, they would have obtained the additional $30,000 required to purchase the Subject Property.

48.   Because the ownership of the mortgage changed and Plaintiffs have been dealing with so many entities, Plaintiffs cannot which Defendant actually provided each of the varying payoff figures they received.

49.   If Defendants assert that the increased demand of $363,228.14 was correct, then Defendants clearly misrepresented the amounts owed in the NOD and Debt Collection Notice provided a mere two months before (*see* **Exhibit C** & **Exhibit D**).

50.   Plaintiffs allege that Defendant HUD misrepresented to Defendant NOVAD that the amount required to stop the sale was $325,326.82 plus fees as of 01/20/2015, or the $336,116.36

total delinquency owed to HUD (*see* **Exhibit C** & **Exhibit D**). NOVAD then conveyed these figures to CIMARRON, who made the representations to Plaintiffs when it included the figures on the Notice of Default and accompanying Debt Collection Notice (*see* **Exhibit C** & **Exhibit D**). Plaintiffs' allegation is supported by the fact that at on January 20, 2015 and January 26, 2015, Ms. Yaksich and Ms. Latner at CIMARRON indicated to Plaintiffs, by and through their agent, Ms. Garcia, at Inter Valley Escrow, that CIMARRON needed to obtain figures from HUD and/or NOVAD before it could provide them to Plaintiffs. Therefore, CIMARRON had to have obtained the initial misrepresented figures on which Plaintiffs relied from either HUD and/or NOVAD.

51. In the alternative, Plaintiffs allege that Defendant HUD correctly represented to Defendant NOVAD the amount required to purchase the Home and stop the sale, which should have been much closer to the $363,228.14 figure later included in the Trustee's Demand for Payoff (*see* **Exhibit F**). But Plaintiffs allege that NOVAD misrepresented to CIMARRON that the amount required to stop the sale was $325,326.82 plus fees as of 01/20/2015, or the $336,116.36 total delinquency supposedly owed to HUD (*see* **Exhibit C** & **Exhibit D**). CIMARRON then conveyed those figures to Plaintiffs when it included the figures on the Notice of Default and accompanying Debt Collection Notice (*see* **Exhibit C** & **Exhibit D**). Plaintiffs' allegation is supported by the fact that at on January 20, 2015 and January 26, 2015, Ms. Yaksich and Ms. Latner at CIMARRON indicated to Plaintiffs, by and through their agent, Ms. Garcia, at Inter Valley Escrow, that CIMARRON needed to obtain figures from HUD and/or NOVAD before it could provide them to Plaintiffs. Therefore, CIMARRON had to have obtained the initial misrepresented figures on which Plaintiffs relied from either HUD and/or NOVAD.

52. In the alternative, Plaintiffs allege that Defendants NOVAD correctly represented to the CIMARRON the amount required to purchase the Home and stop the sale, which should have been much closer to the $363,228.14 figure later included in the Trustee's Demand for Payoff (*see* **Exhibit F**). But Plaintiffs allege that CIMARRON, in violation of its duties as Foreclosure Commissioner, misrepresented to Plaintiffs that the amount required that the amount required to stop the sale was $325,326.82 plus fees as of 01/20/2015, or the $336,116.36 total delinquency supposedly owed to HUD when it included the figures on the Notice of Default and

10
*CORRECTED* SECOND AMENDED COMPLAINT

accompanying Debt Collection Notice (*see* **Exhibit C** & **Exhibit D**). Plaintiffs' allegation is supported by the fact that throughout the relevant time period, as described herein, Ms. Latner at CIMARRON was generally unavailable and its duties conducted in a careless and haphazard manner.

53. If Defendant(s) had not provided the initial erroneous figure, <u>by and through CIMARRON</u>, in the NOD and Debt Collection Notice, Plaintiffs would have obtained financing for the corrected number and closed escrow and would currently own title to the Subject Property.

54. Because of Defendant(s) unlawful conduct, Plaintiffs lost the opportunity to obtain the property, whether they purchased it for $336,116.36 or $363,228.14, withdrew money from SHERRY FRANK's 401k and incurred fees, incurred other fees such as escrow and appraisal fees, and lost the Home that had been in Plaintiffs' family for sixty (60) years.

## FIRST CAUSE OF ACTION
## PROMISSORY ESTOPPEL
### (Against All Defendants)

55. Plaintiffs hereby incorporate each and every preceding paragraph as if the same were fully set forth herein.

56. The elements of a claim for promissory estoppel are: (1) a promise clear and unambiguous on its terms, (2) reliance by the party to whom the promise is made, (3) the reliance is reasonable and foreseeable, and (4) the party is injured by his reliance. *Garcia v. World Savings, FSB*, 183 Cal.App.4th 1031, 1037 (S.D. 2010).

57. Courts have held that promissory estoppel claims in this context are exempt from the statute of frauds. See *Postlewaite v. Wells Fargo, N.A.* 2013 WL 2443257, at 4 (N.D. Cal. June 4, 2013); *Secrest v. Sec. Nat'l Mrtg. Loan Trust 2002-2*, 1167 Cal.App. 4th 544 (2008).

58. Defendants, by and through CIMARRON, made Plaintiffs a promise that was clear and unambiguous on its terms in the NOD: [p]er the Secretary of Housing and Urban Development,

the estimated opening bid will be $325,501.82" and "the amount that must be paid by the Mortgagor, to stop the sale prior to the scheduled sale date is $325,326.82 as of 1/20/15, PLUS all other amounts that are due under the mortgage." *See* **Exhibit C**.

59. Defendants, by and through CIMARRON, also provided Plaintiffs with a Debt Collection Notice informing them the total amount of delinquency was $336,116.36 owed to HUD. *See* **Exhibit D**.

60. Plaintiffs allege that Defendant HUD promised Plaintiffs that the amount required to stop the sale was $325,326.82 plus fees as of 01/20/2015, or the $336,116.36 delinquency owed to HUD (*see* **Exhibit C** & **Exhibit D**). HUD made this clear and unambiguous promise to Plaintiffs by and through its designated agents, NOVAD and/or CIMARRON. CIMARRON, under the direction of HUD and NOVAD, conveyed the promise to Plaintiffs in the Notice of Default dated November 17, 2014 and the accompanying Debt Collection Notice (*see* **Exhibit C** & **Exhibit D**). Plaintiffs' allegation is supported by the fact that as beneficiary under the Loan, HUD is the entity that must determine the amount it requires to cure the delinquency and stop the sale.

61. In the alternative, Plaintiffs allege HUD provided NOVAD with a higher figure that eventually led to the $363,228.14 Plaintiffs were required to pay to stop the sale. NOVAD inaccurately provided a lower figure and promised Plaintiffs that the amount required to stop the sale was $325,326.82 plus fees as of 01/20/2015, or the $336,116.36 total delinquency owed to HUD (*see* **Exhibit C** & **Exhibit D**). NOVAD made this clear and unambiguous promise to Plaintiffs in its position as designated servicer of the Loan and agent of HUD; NOVAD conveyed this promise to CIMARRON. CIMARRON, under the direction of HUD and NOVAD, conveyed the promise to Plaintiffs in the Notice of Default dated November 17, 2014 and the accompanying Debt Collection Notice (*see* **Exhibit C** & **Exhibit D**). Plaintiffs' allegation is supported by the fact that as servicer of the Loan and agent of HUD, NOVAD is should be able to determine the amount HUD requires to cure the delinquency and stop the sale and provide that information to CIMARRON.

62. In the alternative, Plaintiffs allege that NOVAD and/or HUD provided CIMARRON with a higher figure that Plaintiffs were required to pay to stop the sale. But Plaintiffs allege that

CIMARRON inaccurately promised Plaintiffs that the amount required to stop the sale was $325,326.82 plus fees as of 01/20/2015, or the $336,116.36 total delinquency owed to HUD when it included the figures on the Notice of Default and accompanying Debt Collection Notice (*see* **Exhibit C** & **Exhibit D**). CIMARRON made this clear and unambiguous promise to Plaintiffs in its position as designated Foreclosure Commissioner and agent of HUD.

63. As such, Defendants promised that Plaintiffs could stop the sale of the Home by paying the amount of $336,116.36 prior to the sale date.

64. Plaintiffs did indeed rely on said promise from their servicer, NOVAD, the trustee and "Foreclosure Commissioner," CIMARRON, and/or the beneficiary, HUD.

65. In reliance on Defendant(s)' clear and unambiguous promise, Plaintiffs withdrew money from Plaintiff SHERRY's 401k, causing her to have to pay an $8,000 fee, opened escrow, and were ready, able, and willing to make the $336,116.36 payment on the scheduled sale date of January 21, 2015. Defendants, however, were not able to go through with the sale on that date because they had not provided Plaintiffs with a final payoff demand.

66. On or about January 27, 2015, Plaintiffs were somehow provided with a payoff demand from Defendants, by and through CIMARRON, purporting that the total amount owed was $363,228.14. Upon receiving this information, Plaintiffs sought to have the demand letter corrected and also sought to have the foreclosure postponed long enough so that they could obtain the additional funds.

67. If Plaintiffs had been allowed more time or had been provided with the correct figures initially, they would have obtained the additional $30,000 required to purchase the Subject Property.

68. Plaintiffs' reliance on Defendants' promise was reasonable and foreseeable based on Defendants having complete authority over the Loan, the ability to make demands, the ability to allow Plaintiff to purchase the Subject Property, and the power to foreclose on the Subject Property.

69. Plaintiffs' reliance was to their detriment because if Defendant(s) had not provided the initial erroneous figure, by and through CIMARRON in the NOD and Debt Collection Notice,

Plaintiffs would have obtained financing for the corrected number and closed escrow and would currently own title to the Subject Property. Instead, because of Defendant(s)' unlawful conduct, Plaintiffs lost the opportunity to obtain the property, whether they purchased it for $336,116.36 or $363,228.14, withdrew money from SHERRY FRANK's 401k and incurred fees, incurred other fees such as escrow and appraisal fees, and lost the Home that had been in Plaintiffs' family for sixty (60) years. As a result, Plaintiffs have suffered general and special damages in an amount to be determined at trial, but not less than the difference between the $363,228.14 they would have purchased the Home for and the fair market value at the time of the sale.

## SECOND CAUSE OF ACTION

### NEGLIGENCE

### (Against All Defendants)

70. Plaintiffs re-allege and incorporate by reference each of the foregoing allegations as if fully alleged and set forth herein.

71. The basic elements of a negligence action are: (1) The defendant has a legal duty to conform to a standard of conduct to protect the plaintiff, (2) the defendant failed to meet this standard of conduct, (3) the defendant's failure was the proximate or legal cause of the resulting injury, and (4) the plaintiff was damaged. *Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917.

72. Defendants have engaged in a systematic pattern of misconduct and negligence with respect to the Loan and Plaintiffs' demand and extension letters ever since Plaintiffs' first sought assistance. Defendants did not deal reasonably with Plaintiffs to try to effectuate a workable solution and timely response, and therefore, owed, and still owe, a duty of care to Plaintiff.

73. It was clearly foreseeable that the delays, misinformation, and overall carelessness by Defendants would cause Plaintiffs to rely on the initial demand amount, to rely on the fact that Defendants were to provide an updated demand and extension letter, lose opportunities to avoid the foreclosure of the family's Home, and eventually, to lose the Home in a foreclosure sale.

*(A.) Defendants have a Legal Duty to Conform to a Standard of Conduct to Protect Plaintiffs.*

74. As a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional rolas as a mere lender of money. *Alvarez v. BAC Home Loan Servicing*, 228 Cal.App.4th 941 at 945. However, even when the lender is acting as a conventional lender, the no-duty rule is only a general rule. The court stated that *Nymark v. Heart Fed Servicings & Loan Association*, 231 Cal.App.3d 1089, does not support the sweeping conclusion that a lender never owes a duty of care to a borrower.

75. Here, however, Plaintiffs were not borrowers under the Loan and Defendants were not acting in the conventional role as a mere lender of money. Thus, Defendants owed Plaintiffs a reasonable duty of care, as any person or business has toward another.

76. Furthermore, in *Alvarez*, the California Court of Appeal correctly held that *Nymark* rule could not be read so broadly as to effectively shield servicers from negligence in every circumstance. Instead, the court noted, "[e]ven when the lender is acting as a conventional lender, the no-duty rule is only a general rule…. *Nymark* does not support the sweeping conclusion that a lender never owes a duty of care to a borrower. Rather, *Nymark* court explained that the question of whether a lender owes such a duty requires "the balancing of the '*Biakanja* factors.' *Alvarez* at 945, citing *Jolley v. Chase Home Finance, LLC*, 213 Cal.App.4th 872, 901. The court explained that the *Nymark* rule simply stated that if a bank was acting in its conventional role as a lender, then several factors should be considered in determining whether a duty of care exists. These factors called the "*Biakanja* factors," *infra*, named after *Biakanha v. Irving* (49 Cal.2d 647, 650), a 1958 California Supreme Court case which set forth the six considerations necessary to determine whether a duty of care exists in this context.

77. The Court of Appeals in both *Alvarez* and *Jolley*, following the *Nymark* decision (*supra*), used the six-part test known as "the Biakania factors" (*supra*) to determine whether a lender owes a borrower of a duty of care: (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame, and (6) the policy of preventing future harm. *Biakanja v.*

1  *Irving*, 49 Cal.2d 647, 650 (1958); *Accord, Jolley, supra*, at 899; *Alvarez, supra*, at 948; *Garcia v. Ocwen Loan Servicing, LLC*, 2010 WL 1881098, at *4 (N.D. Cal.May 10, 2010); *See also, Wilson v. Household Finance Corp.*, 2013 WL 1310589 (E.D. Cal. Mar.28, 2013); *Trant v.Wells Fargo Bank, N.A.*, 2012 WL 2871642, at *6 (S.D. Cal. July 12, 2012).

78. Here, Defendants owed Plaintiffs a duty of care.

79. Applying the *Biakanja* factors, engaging in an initial demand of an erroneous amount and waiting until a date very close to the sale date to point out any correction was undeniably **intended to affect Plaintiffs** because providing the correct amount and informing Plaintiffs of such a mistake at an early stage of the transaction would prevent the Subject Property, the family Home, from being sold.

80. The **foreseeability of harm** to Plaintiffs was high because providing inaccurate information to Plaintiffs, refusing to provide a payoff demand until a day before the scheduled sale date, alleging that the amount owed was $30,000 higher than initially stated, and refusing to further postpone the sale of the Home made the future loss of Plaintiffs' Home almost inevitable and deprived them of even the opportunity to obtain relief.

81. **Plaintiffs were most definitely injured**: Plaintiffs lost the ability to purchase the Home for the initial demand amount, they lost the ability to even obtain the additional $30,000, they lost the Home that has been in Plaintiff's family for sixty (60) years, and as such, lost the equity they would have gained in the Home.

82. **Defendants' conduct and Plaintiffs' injury are closely connected** because if Defendants had provided an accurate demand from the beginning and/or if Plaintiffs had been allowed more time upon receipt of the increased demand, Plaintiffs would have been able to purchase their longtime family Home.

83. **Defendants' conduct certainly was deserving of moral blame** because Plaintiffs were completely at Defendants' mercy with regard to servicing of the Loan, the foreclosure, and the sale and Defendants may have been financially incentivized to mishandle the process in order to gain the equity for themselves. As a result, Plaintiffs have lost the Home that has been in their family for sixty (60) years.
16

*CORRECTED* SECOND AMENDED COMPLAINT

84. There is now **strong public policy** in favor of protecting homeowners from foreclosure, as evidence by state and federal regulations. *See, e.g. Cal.Civ.Code § 2923.6*.

85. Thus, the six *Biakanja* factors weigh heavily in Plaintiffs' favor and establish that Defendants did, in fact, owe Plaintiffs a duty of care.

**(B) *Defendants Failed to Meet the Standard of Conduct***

86. Defendants, and each of them, breached their duty to Plaintiffs.

87. Defendant HUD acted negligently when it: 1) incorrectly told Plaintiffs, by and through its agents, NOVAD and CIMARRON, Plaintiffs could stop the sale if they cured the delinquent amount of $336,116.36; 2) then told Plaintiffs, by and through its agents, NOVAD and CIMARRON, that the initial amount was incorrect and HUD required almost an additional $30,0000; 3) did not inform Plaintiffs, by and through its agents, NOVAD and CIMARRON, of its increased demand until the day before the scheduled sale; 4) did not provide Plaintiffs with sufficient time to obtain the additional $30,000 requested; and 5) foreclosed on the Home while it had knowledge that Plaintiffs were still interested and willing to make the necessary demand payments.

88. Defendant NOVAD, acted negligently when it: 1) incorrectly told Plaintiffs, by and through CIMARRON, that Plaintiffs could stop the sale if they cured the delinquent amount of $336,116.36; 2) then told Plaintiffs, by and through CIMARRON, that the initial amount was incorrect and HUD required almost an additional $30,0000; 3) did not inform Plaintiffs, by and through CIMARRON, of HUD's increased demand until the day before the scheduled sale; 4) did not provide Plaintiffs with sufficient time to obtain the additional $30,000 requested; 5) failed to adequately communicate with Plaintiffs, independently and by and through CIMARRON, by providing inaccurate and untimely information concerning the Loan and sale of Plaintiffs' Home; and 6) instructed CIMARRON to foreclose on the Home while it had knowledge that Plaintiffs were still interested and willing to make the necessary demand payments and that it had caused the need for delay in the first place.

89. Defendant CIMARRON acted negligently when it: 1) incorrectly told Plaintiffs that Plaintiffs could stop the sale if they cured the delinquent amount of $336,116.36; 2) then told

Plaintiffs that the initial amount was incorrect and HUD required almost an additional $30,0000; 3) did not inform Plaintiffs of HUD's increased demand until the day before the scheduled sale; 4) did not provide Plaintiffs with sufficient time to obtain the additional $30,000 requested; 5) foreclosed on the Home while it had knowledge that Plaintiffs were still interested and willing to make the necessary demand payments that it had caused the need for delay in the first place; and 6) continuously and repeatedly failed to adequately communicate with Plaintiffs by providing inaccurate and untimely information concerning the Loan and sale of Plaintiffs' Home.

90. As such, Defendants, and each of them, breached their duty and failed to deal with Plaintiffs with a reasonable duty of care.

**(C.) *Defendants' Failure Was the Proximate and Legal Cause of the Resulting Injury***

91. But for the actions and omissions of Defendants as described hereinabove, Plaintiffs would not have lost their Home. Because Defendants were in full control of the Loan and sale, it is reasonably foreseeable that Plaintiffs would rely on Defendants to provide an accurate payoff demand and handle all requests in a timely manner.

**(D.) *Plaintiffs were Damaged***

92. But for the negligence and carelessness of Defendants as set forth above, Plaintiffs would have obtained financing for the corrected number and closed escrow and would currently own title to the Subject Property. Instead, because of Defendant(s)' unlawful conduct, Plaintiffs lost the opportunity to obtain the property, whether they purchased it for $336,116.36 or $363,228.14, withdrew money from SHERRY FRANK's 401k and incurred fees, incurred other fees such as escrow and appraisal fees, and lost the Home that had been in Plaintiffs' family for sixty (60) years. As a result, Plaintiffs have suffered general and special damages in an amount to be determined at trial, but not less than the difference between the $363,228.14 they would have purchased the Home for and the fair market value at the time of the sale.

///
///

|   |   |
|---|---|
| 1 | **THIRD CAUSE OF ACTION** |
| 2 | NEGLIGENT MISREPRESENTATION |
| 3 | (Against All Defendants) |

93. Plaintiffs re-allege and incorporate by reference each of the foregoing allegations as if fully alleged and set forth herein.

94. The elements of negligent misrepresentation are: (1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with the intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damages. *Apollo Capital, LLC v. Roth Capital Partners, LLC*, 158 Cal.App. 4th 226 (2d Dist.2007); *Century Sur. Co. v. Crosby Ins. Inc.* 124 Cal.App.4th 116 (4th Dist. 2004).

95. Loan servicers owe a duty not to make material misrepresentations. *Lueras v. BAC Home Loans Servicing, LP*, 221 Cal.App.4th 49, 67 (2013). "It is foreseeable that a borrower might be harmed by an inaccurate or ultimately communication..." *Id.*

96. On or about November 17, 2014, Defendants, represented by and through Ms. Latner at CIMARRON, in the NOD: [p]er the Secretary of Housing and Urban Development, the estimated opening bid will be $325,501.82" and "the amount that must be paid by the Mortgagor, to stop the sale prior to the scheduled sale date is $325,326.82 as of 1/20/15, PLUS all other amounts that are due under the mortgage." *See* **Exhibit C**.

97. At that time, Defendants, by and through Ms. Latner at CIMARRON, also represented in the Debt Collection Notice that the total amount of delinquency owed to HUD was $336,116.36. *See* **Exhibit D**.

98. Suddenly, on or about January 27, 2015, Defendants, by and through CIMARRON, provided Plaintiffs with a payoff demand purporting that the total amount owed was $363,228.14. Upon receiving this information, believing it to be a mistake, Plaintiffs sought to have the demand letter corrected. When this did not occur, Plaintiffs sought to have the sale further postponed to allow them the time to obtain the difference in funds.

*CORRECTED* SECOND AMENDED COMPLAINT

99. Plaintiffs allege that Defendant HUD misrepresented to Plaintiffs, by and through its agents, NOVAD and CIMARRON, that the amount required to stop the sale was $325,326.82 plus fees as of 01/20/2015, or the $336,116.36 total delinquency owed to HUD (*see* **Exhibit C** & **Exhibit D**). HUD conveyed the incorrect figures to NOVAD and/or CIMARRON. CIMARRON then made these representations to Plaintiffs when it included the figures on the Notice of Default and accompanying Debt Collection Notice it sent to Plaintiffs at the Subject Property (*see* **Exhibit C** & **Exhibit D**). Plaintiffs' allegation is supported by the fact that at on January 20, 2015 and January 26, 2015, Ms. Yaksich and Ms. Latner at CIMARRON indicated to Plaintiffs, by and through their agent, Ms. Garcia, at Inter Valley Escrow, that CIMARRON needed to obtain figures from HUD and/or NOVAD before it could provide them to Plaintiffs. Therefore, CIMARRON had to have obtained the initial misrepresented figures on which Plaintiffs relied from either HUD and/or NOVAD.

100. In the alternative, Plaintiffs allege that Defendant HUD correctly represented to NOVAD the amount required to purchase the Home and stop the sale, which should have been much closer to the $363,228.14 figure later included in the Trustee's Demand for Payoff (*see* **Exhibit F**). But Plaintiffs allege that NOVAD misrepresented to Plaintiffs, through CIMARRON, that the amount required to stop the sale was $325,326.82 plus fees as of 01/20/2015, or the $336,116.36 total delinquency owed to HUD (*see* **Exhibit C** & **Exhibit D**). NOVAD conveyed the incorrect figures to CIMARRON. CIMARRON then made these representations to Plaintiffs when it included the figures on the Notice of Default and accompanying Debt Collection Notice sent to Plaintiffs at the Subject Property (*see* **Exhibit C** & **Exhibit D**). Plaintiffs' allegation is supported by the fact that at on January 20, 2015 and January 26, 2015, Ms. Yaksich and Ms. Latner at CIMARRON indicated to Plaintiffs, by and through their agent, Ms. Garcia, at Inter Valley Escrow, that CIMARRON needed to obtain figures from HUD and/or NOVAD before it could provide them to Plaintiffs. Therefore, CIMARRON had to have obtained the initial misrepresented figures on which Plaintiffs relied from either HUD and/or NOVAD.

101. In the alternative, Plaintiffs allege that NOVAD correctly represented to the CIMARRON the amount required to purchase the Home and stop the sale, which should have been much